## Aetna Life Insurance Co. v. Bethel.

(Decided November 16, 1910.)

### Appeal from Henderson Circuit Court.

1. Insurance—Accident—Pleading.—Where an accident policy provided indemnity against loss of time "resulting from bodily injuries effected through external, violent or accidental means, which independently of all other causes immediately, continuously and wholly disables the insured from prosecuting any

kind of business," and further provided that if "death results solely from such injuries within ninety days," the company would pay a stipulated sum, it was not necessary that a petition to recover the indemnity provided for death should charge that the injury immediately, continuously and wholly disabled the insured from prosecuting his business. The words "immediately, continuously and wholly" relate to losses growing out of disability to labor and not to death.

2.  Construction of Policy.—The policy provided that "in the event of death following bodily injuries of which there existed no external or visible mark upon the body of contusion or wound sufficient to cause death, the limit of the company's liability should be one-fifth the amount otherwise payable." Under this provision, the contusion or wound, of which there is external or visible mark, must in itself be sufficient to cause death in order to prevent the operation of this limiting clause. Although the contusion or wound may have been produced by an accident and be serious. external and visible, there cannot be a recovery for the full amount in the event of death unless the contusion or wound was sufficient to cause death.

3.  Construction of Policy.—If an insurance contract is susceptible of two constructions, or is of doubtful meaning, the courts will give to it that construction most favorable to the insured.

4.  Pleading.—It is only essential that the petition shall bring the cause of action within those provisions of the policy relied upon for a recovery. It is not necessary that other clauses, conditions or provisions should be mentioned or referred to.

5.  Proofs of Loss—"Immediate" Notice.—The policy provides that "immediate" notice in writing of any accident or injury should be given to the company, but the word "immediate" is not to be construed literally, but as meaning that notice must be furnished within a reasonable time and in such time as the beneficiary can reasonably obtain information upon which to base it.

6.  Proofs of Loss.—In every instance a reasonable time should be allowed in which to give the preliminary notice of one injured, as required, and to furnish proofs of loss. What is a reasonable time in which notice must be given and proofs of loss furnished is a question that depends upon the circumstances and conditions of each case, and if put in issue is to be determined as any other question of fact by the jury.

7.  Proofs of Loss.—Giving the notice and furnishing preliminary proofs of loss are conditions precedent, unless waived, to the bringing of an action, and the petition should aver that notice was given and proofs of loss furnished or set out facts showing that notice and proofs were waived by the company.

8.  Proofs of Loss.—Insurance companies should not be permitted to trifle with, mislead or attempt to mislead their patrons by by acts of conduct indicating that proofs of loss need not be furnished. If they do, they will not be permitted to defeat a recovery upon the ground that proofs of loss were not furnished.

9 Proofs of Loss.—When the company has notice that a claim will be made, slight acts upon its part indicating that it denies liability, will amount to a waiver

10. Proofs of Loss—Waiver.—When the petition sets out a substantial compliance with the contract in respect to furnishing proofs of loss, or states facts that will amount to a waiver on the part of the company, and the answer does not make any issue upon this question, it cannot thereafter be raised either in evidence or argument. If an issue is made, it becomes a question of fact.

11. Evidence—Husband and Wife.—A widow cannot testify as to conversations or transactions had with her husband, but she may give evidence concerning his appearance and condition.

12. Expert Witnesses.—It is permissible in the examination of a witness introduced as an expert to submit a hypothetical question, and ask his opinion thereon, or, if the witness has personal knowledge he may give his opinion based on such knowledge; but the question should not be put in such a form as to make the answer the conclusion of the witness instead of his opinion. It is the office of the expert to express an opinion, and the province of the jury to draw its own conclusion from the opinion so expressed

13. Death Not Due Solely to Accidental Causes.—It is indispensible to a recovery that death shall result from accident independent of other causes; but if the evidence shows that an accident produced a disease that was the immediate cause of the death of the insured, his death will be attributed to the accident, and there may be a recovery. But, unless the evidence does show that the disease from which the insured died was solely due to the accident, the company is not liable.

YEAMAN & YEAMAN for appellant.

JOHN C. WORSHAM for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The appellant company issued to Dr. John T. Bethel a policy of accident insurance that was in full force at the time of his death in April 1909. In one clause, it was provided that the company in consideration of stipulated premiums would pay the insured the—

"Sum of twenty-five dollars per week indemnity against loss of time resulting from bodily injuries effected, during the term of this insurance, through EXTERNAL, VIOLENT AND ACCIDENTAL MEANS, which shall, independently of all other causes, immediately, continuously and wholly disable him from prosecuting any and every kind of business pertaining to his occupation, above stated; or if such injuries shall not

wholly disable the insured, as above, but shall imme-
diately, continuously, and wholly disable him from
the performance of one or more important daily duties
pertaining to the occupation, or if, following a period of
total disability resulting from such injuries, he shall be
in like manner partially disabled, the company will pay
two-fifths of the weekly indemnity herein provided for
total disability for the period of such partial disability
but not for more than twenty-six consecutive weeks of
partial disability, nor will payments be made for total
disability or total and partial disability combined exceed-
ing in amount the principal sum insured by this policy
as stated in clause 'e.' "

Following this clause there are several others, pro-
viding compensation and indemnity for injuries result-
ing in the loss of feet, hands and other members of the
body; and then this one:

"If death results solely from such injuries within
ninety days the said company will pay the principal sum
of five thousand dollars to Bell Bethel, his wife. * * * In
event of death following bodily injuries of which there
existed no external or visible mark upon the body of
contusion or wound sufficient to cause death (accidental
drowning only excepted) and an autopsy showed that
such injuries materially contributed to the death of the
insured, then in all such cases referred to in this para-
graph, the limit of this company's liability shall be one-
fifth the amount otherwise payable under this policy,
anything to the contrary in this policy notwithstand-
ing."

It was further provided that:

"Immediate notice in writing of any accident or in-
jury on account of which claim is to be made shall be
given said company at Hartford, Conn., with full par-
ticulars and full name and address of the insured; and
unless affirmative proof of death, loss of limb or sight, or
duration of total or partial disability, and that the same
was the proximate result of external, violent and acci-
dental means, is so furnished within five months as to
death, loss of limb or sight, from the happening of such
accident, * * * the company shall be released from all
liability for the payment of any claim based thereon."

About 11 o'clock on the morning of April 6th, 1909,
Dr. Bethel, returning from a visit to a patient, drove his
buggy up to his home, and while attempting to alight
therefrom fell to the ground, and on April 23d, 1909,

died. The beneficiary in the policy, who was his widow, the appellee Bell Bethel, insisted that his death was caused by the fall, demanded of the company that it pay to her the full amount stipulated in the policy, and upon the refusal of her demand, she brought suit to recover the amount.

The petition, after reciting the clauses of the policy under which the company agreed to pay the amount claimed, and that have been heretofore set out, averred that:

"On or about the —— day of April, 1909, the insured, the said John T. Bethel, while attempting to get out of his buggy in front of his office in the city of Henderson, Ky., through external, violent and accidental means, fell and sustained such injuries to his head and body as, independently of all other causes, resulted in his death on the 23d day of April, 1909.  *  *  *  Plaintiff says that as soon as she learned of the cause of the insured's death, and was informed of the defendant's liability therefor under its said policy, to-wit: On the 26th day of July, 1909, she notified the defendant in writing, addressed to it at Hartford, Conn., of said accident and injury to the insured and his resulting death, giving in said notice the full name of the insured and the number of his insurance policy with defendant, and requested the defendant to furnish her with blanks for making up proofs of death. She says that said notice was received by the defendant, but that it did not reply to same, and that it neglected and refused to furnish her with said blanks for proofs of death; that it was the custom of the defendant to furnish such blanks.  *  *  *

It further averred in substance that in August, 1909, the company sent its adjuster to Henderson to investigate the claim, and the adjuster represented to plaintiff that he wanted the names of the witnesses to the accident, and the physicans who attended him, so that he could make a full and complete investigation for his company, and that as soon as said investigation was made the defendant would notify plaintiff whether or not her claim would be paid. That relying upon said representations she gave the agent such information as he desired, and he made a full investigation of said claim, but that the company never notified her whether or not it would pay said claim, nor requested of her further

proofs of death, and by this conduct waived any right it might have had to require said proofs. She further averred that before the institution of this suit, she sent proofs of death to the defendant at its office in Hartford, Connecticut.

To this petition the company filed a general demurrer, which was overruled. It then answered, denying that Dr. Bethel through external, violent or accidental means fell or sustained such injuries or any injuries to his head or body as, independently of all other causes, or at all, resulted in his death; or that his death was due or caused by said accident.

In another paragraph it pleaded "that no accident that befell the said Bethel, caused any external or visible marks upon his body of contusion or wound, and there did not exist any external or visible mark upon his body of contusion or wound at all; nor was any autopsy had over his body." It then set up the terms of the policy, providing that unless there existed external or visible marks upon the body of contusion or wound sufficient to cause death, the company would not in any event be liable exceeding one-fifth of the amount otherwise payable under the policy. But did not raise any issue or question as to the sufficiency of the notice of the injury or the proofs of loss.

A trial before a jury resulted in a verdict in favor of the appellee for five thousand dollars. From the judgment upon this verdict this appeal is prosecuted.

The first error assigned is that the petition did not state a good cause of action (1) because it failed to allege that the accident "independently of other causes, immediately, continuously and wholly disabled the insured from prosecuting any and every kind of business pertaining to his occupation," (2) it failed to state sufficiently that the company was furnished with notice and proofs of injury and death.

It is the contention of counsel for the appellant that the petition should have stated not only that the injury received by Dr. Bethel resulted from external, violent and accidental means, independently of all other causes, but that such injuries "immediately, continuously and wholly disabled the insured from prosecuting any and every kind of business pertaining to his occupation."

The contract of insurance contains several indemnity features, some of them providing compensation for total disability, others compensation for partial disability,

and yet others compensation for the loss of limbs and other parts of the body. The words "immediately, continuously and wholly disable the insured from prose-cuting any and every kind of business pertaining to his occupation" are in a clause providing for weekly in-demnity, when the insured is immediately, continuously and wholly disabled from prosecuting his business, or, immediately, continuously and wholly disabled from per-forming one or more important daily duties pertaining to his occupation. And the words "immediately, con-tinuously and wholly" relate to the weekly indemnity that will be paid and not to indemnity for death. If the attempt is to recover weekly indemnity, then the insured must allege that the accident immediately, continuously and wholly disabled him. In other words, he must bring himself within the clause of the contract that makes the company liable by setting out that the conditions upon which its liability depends exist. But if, as a result of bodily injuries, caused by external, violent and acci-dental means, independently of all other causes the in-sured comes to his death, within ninety days from the date of the injury, the liability of the company attaches without reference to whether the injury immediately, continuously or at all disabled the insured from follow-ing his occupation. The separate clause in the policy relating to indemnity for death and which provides that it shall be paid "if death results solely from such in-juries" refers alone to such injuries as are the result of "external, violent and accidental means, which inde-pendently of all other causes" produced the death, and not to such injuries as immediately, continuously and wholly disabled the insured from following his occupa-tion. If the death of the insured results from external, violent and accidental means, independent of any other cause, within ninety days from the time the injuries are received, it is wholly immaterial whether or not he could follow his occupation or business during the time that elapsed between the injuries and his death. The liability of the company does not depend upon the condition of the health of the insured or his ability to labor between the time of the injuries and the death. Nor does the right of the beneficiary to recover depend upon the fact that between the injury and the death the insured was at all times unable to follow his business or pursue his vocation. There is good reason for making the lia-bility of the company depend upon the total or partial

disability of the insured to labor when the indemnity is only to compensate him for his inability to labor: But there is no reason for applying these conditions to a claim for indemnity for death alone. In the one case the words have and can be given a reasonable and sensible meaning and application, in the other they might not have any meaning whatever, as where death resulted immediately from the injury. It was only essential that the pleader should bring himself well within the provisions of those clauses of the policy upon which he relied for a recovery: It was not necessary that he should mention or refer to other clauses, conditions or provisions in the contract that did not apply to the state of facts upon which the right to indemnity rested. Continental Casualty Co. v. Hunt, 28 Ky. Law Rep., 1006; American Accident Co. v. Carson, 99 Ky., 441; Aetna Ins. Co. v. Milward, 118 Ky., 716

The next reason for insisting that the demurrer should have been sustained is that the petition does not sufficiently show that notice or proofs of loss in compliance with the contract of insurance were furnished to the company. The policy provides that "immediate notice in writing of any accident or injury on account of which claim is to be made shall be given said company at Hartford Conn., with full particulars and full name and address of the insured  *  *  *." But the failure to furnish immediate notice is not a condition precedent to a recovery. The word "immediate" is not to be construed literally, but as meaning that notice must be furnished within a reasonable time, and in such time as the beneficiary can reasonably obtain information upon which to base it. It may often happen that the beneficiary does not immediately know or cannot at once decide whether or not any claim for compensation or indemnity will be presented, or does not know immediately that the injury the insured sustained was due to causes that under the contract entitled him to compensation or indemnity. It is, of course, important to the company that it shall receive within a reasonable time and as soon as the circumstances and facts of the case will permit, notice that a claim will be presented against it for compensation, or indemnity, so that it may have opportunity to make such investigations as it considers necessary while the facts are fresh in the minds of the persons acquainted with them, and take steps to obtain such information as it desires concerning the cause as well as

the effect of the injury and accident. But this right of the company is not an arbitrary one, nor should it be allowed by the mere wording of the contract to impose upon the insured conditions or limitations that in many instances would defeat without good cause the object of the contract and permit it to escape a just obligation. We therefore think that in every instance a reasonable time should be allowed in which to give the preliminary notice if one is required and to furnish proof of loss. What is a reasonable time in which notice must be given and proofs furnished, depends upon the circumstances and conditions of each case, and this question if put in issue is to be determined as any other question of fact— by a jury under proper instructions. Giving the notice and furnishing preliminary proof are conditions precedent to the bringing of an action unless waived, and so the petition should aver that within a reasonable time after the accident upon which the cause of action rests occurred, and within the time fixed by the policy, if it allows a reasonable time, notice was given to the company and proofs of loss furnished, or that it set out facts showing that notice and proofs of loss, or either, as the case may be, were waived by the company. The policy in this case does not specify the time in which the notice shall be given—merely providing that it shall be "immediately." And the averment that "the plaintiff as soon as she learned of the cause of the insured's death and was informed of the defendant's liability therefor under said policy, to-wit: on the 26th day of July, 1909, gave notice," was a sufficient compliance with the requirement for preliminary notice specified in the policy. It will be observed that the policy further provides that this preliminary notice shall be followed up by proofs of death, and that these proofs must be submitted within five months from the happening of the accident that resulted in the death. The petition shows that no proofs of death were furnished, but it stated sufficient reasons to show that the proofs were waived. Insurance companies should not be permitted to trifle with, or mislead, or attempt to mislead their patrons, by acts or conduct indicating that proofs of loss need not be furnished. If they do, they will not be permitted to defeat a recovery upon the ground that proofs were not furnished. If the company wishes proofs of loss, it should not do anything that would cause a person of ordinary prudence and intelligence to conclude that it does not

want them. We do not mean to hold that the mere failure of the company to call for proofs of loss will in itself be a waiver of the right to demand them or authority to the insured to bring an action without furnishing the proofs. But we do mean that when the company has notice that a claim will be made, slight acts upon its part indicating that it denies liability will amount to a waiver. Woodmen Accident Ass'n v. Byers, 62 Neb., 673, 55 L. R. A., 291; Kenton Ins. Co. v. Downs, 90 Ky., 236; Aetna Life Ins. Co. v. Milward, 118 Ky. 716; Home Ins. Co. v. Kobb, 113 Ky., 360; Phoenix Ins. Co. v. Spiers, &c. 87 Ky., 285; Fidelity & Casualty Co. v. Cooper, 126 S. W. 111.

But, aside from what we have said, there is another conclusive reason why the company can not now raise any question about the sufficiency of the notice or the proofs of loss or the failure to furnish either of them in due time. If it desired to resist the payment of the policy upon the ground that the notice or proofs of loss were not furnished, or were not furnished in due time, it should have raised this issue in its answer, and its failure to do this was an admission that the requirements of the policy in this particular were sufficiently complied with. When the petition sets out a substantial compliance with the contract of insurance in respect to furnishing preliminary notice and proofs of loss, or states facts that will amount to a waiver by the company of the right to demand them, and the answer does not make any issue upon this question, it cannot thereafter be raised either in evidence or argument. On the other hand, if an issue is made by the answer, then it becomes a question of fact to be determined as are other questions of fact, and the court should instruct the jury concerning it. Knickerbocker Ins. Co. v. Schneider, 100 U. S., 25 L. Ed., 695; Lancashire Ins. Co. v. Monroe, 101 Ky., 18.

The next error assigned is that the wife of Dr. Bethel, and the beneficiary in the policy, was permitted to testify. It is not competent for the widow to testify as to conversations, or transactions had with her husband. But, she may give evidence concerning his appearance and condition, as these are facts that do not come to her knowledge by reason of the marital relation, but may be known and seen by all persons who have opportunity to and do observe the condition of the husband. Fidelity & Casualty Co. v. Cooper, 126 S. W., 111; Metropol-

itan Ins. Co. v. Thomas, 38 Ky. Law Rep., 770; Bankers Fraternal Union v. Donahue, 109 S. W., 878; Manhattan Ins. Co. v. Beard, 112 Ky., 455.

Another question raised by counsel for appellant relates to the form of question asked the medical witness introduced by counsel for appellee, and the answer thereto. The immediate cause of the death of Dr. Bethel was the disease known as auto-intoxication, and a physician introduced was asked questions of which this is an example: "I will ask you whether or not the fall of which he told you, in your opinion produced auto-intoxication?" The witness, who had theretofore explained what auto-intoxication was, answered, "In my judgment, that was the cause." This question, as well as the answer, was objectionable. It is permissible in the examination of a witness introduced as an expert, to submit a hypothetical question, and ask his opinion thereon; or, if the witness has personal knowledge of the matter he is inquired of concerning, he may give his opinion based on such knowledge. But the question should not be put in such form as to make the answer the conclusion of the witness, instead of his opinion. It is the office of the expert to express an opinion and the province of the jury to draw its own conclusions from the opinion, so expressed. Here, the witness not only expressed his opinion, but also drew from his own opinion a conclusion upon a question which was the very matter in issue. The facts upon which the opinion of the expert was desired should have been submitted to him in a question, and his answer should have been his opinion, and not his conclusion. The witness stated that the fall produced auto-intoxication, when this was the question the jury was called upon to decide. The witness should have been asked, if in his opinion a fall such as Dr. Bethel received would produce auto-intoxication; and should have confined his answer to an expression of opinion upon this question, in place of testifying that the auto-intoxication was the result of a fall. Aetna Life Ins. Co. v. Kaiser, 115 Ky. 539; Baehr v. Union Casualty Co., 113 S. W. 689; Davis v. Travelers Ins. Co., 59 Kansas, 521, 52 Pacific Rep., 67.

We have reserved for the last the most serious question raised by counsel, and which is, that the verdict upon the whole case, is flagrantly against the evidence, and especially so as to the recovery in excess of one thousand dollars. In the consideration of this question,

it will be necessary to relate with some particularity the facts disclosed by the record. At the time Dr. Bethel died, he was about 70 years of age. He had been an active, vigorous man, and during the twenty-eight years preceding his death had only been sick twice—once when he broke his ribs while alighting from a street car in December, 1908, and again when he had an attack of auto-intoxication and circumscribed pneumonia in February, 1909.. On the morning of April 6th, in returning from a visit to a patient, he drove his buggy up to his home, and while attempting to alight therefrom, fell to the ground. It does not appear that any person saw him fall from the buggy, but he was seen to drive up to his residence, and when the attention of nearby witnesses was directed to him, he was pulling himself up out of the street, to which he had fallen, by means of the buggy wheel and shaft, and they saw him walk slowly into the house. When he got into the house, his wife, who did not see him fall or know the cause of his appearance, noticed that his face and clothes were soiled from contact with the street, and that the stiff hat he wore was dented in. He did not eat any dinner, and in the afternoon went to bed and continued to grow worse from that time until his death, which occurred on April 23, 1909. On April 8th, Dr. Hancock was called to see him, and after obtaining a history of the case, and making an examination, he diagnosed his illness as an attack of auto-intoxication. For this ailment, he treated Dr. Bethel for a few days, when his condition became so alarming that he called in Doctors Dixon, Hanna and Ligon, who concurred in the diagnosis of Dr. Hancock. Dr. Hancock testifies as follows:

Q. Just tell what you found when you saw Dr. Bethel on April 8th?

A. I found a very sick man. He had headache and pains; had distension of the bowels; had some diarrhea; and fever and rapid pulse, quick; not in a very clear mental condition, at times delirious and talked off.

Q. How often did you visit him?

A. I visited him every day and sometimes twice; sometimes three or four.

Q. What was the progress of the disease from the time you first saw him?

A. He never improved, grew constantly worse until his death.

Q.  What was the name of the disease he had?

A.  Auto-intoxication, as we regarded his condition.

Q.  Can you say what produced that, in your opinion?

A.  Auto-intoxication is the absorption from the intestinal canal of the poisonous products, and this poisoned him and killed him.

Q.  Tell what you learned from Dr. Bethel, and when you diagnosed his case, what time were you called first?

A.  Early in the morning, perhaps 7 or 8 o'clock. He had been right sick during the night, but they had not called me until daylight.

Q.  From whom did you get the history of the case?

A.  From him.

Q.  Tell the jury what was the history of that case?

A.  In getting the history, he said to me that he had had a fall out of his buggy, and that he thought it shook him up worse than the other fall. He had reference to the fall he had when he fractured his rib, and for which I didn't attend him, but I saw him socially during that time, and this was the fall he was referring to when he said this last fall shook him up worse than the other fall.

Q.  What causes auto-intoxication?

A.  Anything that will prevent nature from taking care of the products entering the alimentary canal and thus allowing it to ferment in the system; anything that will prevent the liver from secreting its bile, and the stomach from doing its part; anything that would prevent any of these would contribute to auto-intoxication. In this case, the most satisfactory explanation of the case was this history of the fall that he had at that time which shook him up, and his alimentary track was not doing the work, and we were never able to make it do the work to amount to anything at all.

Q.  I will ask you whether or not the fall of which he told you, in your opinion, produced this auto-intoxication?

A.  In my judgment that was the cause. Anything that would shake up the nervous system to such an extent as to paralyze, would cause these organs to go on a strike, and we were never able to make them work any more.

Asked if auto-intoxication was not the absorption of poisonous products from the intestinal canal, he answered, "Auto-intoxication can and does come from that. If there is poison of whatever cause in there, and it is absorbed, it will produce auto-intoxication.

Dr. Hancock further testified that in December, 1908, Dr. Bethel fell from a street car and broke some of his ribs, but he did not know how long he was disabled on that account, and that in February, 1909, he had trouble with his right lung and also auto-intoxication, and on account of this attack was confined to his house and unable to perform his duties for some two weeks. There is also evidence that his symptoms in February, 1909, were somewhat like his symptoms in April, 1909, and that after he was able to attend to his business he complained of his head, sometimes of his side, and occasionally of the condition of his bowels. Dr. Hancock being asked how the auto-intoxication manifested itself in the February 1909 attack, said: "He had two conditions at this time, and it would be difficult to say how much was due to one and how much to the other. He had diarrhea." It further appears from Dr. Hancock's evidence, that although Drs. Dixon, Ligon and Hanna were called in consultation to see Dr. Bethel, he did not mention the fall from the buggy to them, and that they did not know until sometime afterwards that the auto-intoxication was attributed by any person to the fall—in short, although all the doctors diagnosed the disease as auto-intoxication, the question of its being caused by the fall from the buggy was not mentioned or discussed by any of them.

Dr. Dixon, called as a witness for the appellee, said that when he was called in, some days after Dr. Bethel was first attacked, he found him suffering from auto-intoxication and that this disease was the cause of his death. Asked to explain to the jury what auto-intoxication was, he said:

"Auto-intoxication is a condition wherein a man is poisoned by products which have formed in his own body. Auto means by itself; intoxication, a condition of poisoning. An auto-intoxication means the absorption of these poisons that are generated in the body of the man. They are not generated from the outside, but are generated from the inside, and they get into his circulation and interfere with his metabolism. Metabolism is that change that is constantly taking place in a man's body. Now, auto-intoxication can be brought on by an alteration of the metabolism; frequently it comes by acute indigestion. Some condition that would tend to lower the vitality and make the man a fit subject for auto-intoxication. It can be produced by bodily injuries,

or anything that would tend to lower the vitality of. a man.

It will be observed that although the evidence establishes that Dr. Bethel's death was due to auto-intoxication, the evidence that it was produced solely by the fall is very unsatisfactory. Auto-intoxication, as testified to by the physicians, is a disease that may be caused by a fall or by anything else that debilitates the system, lowers the vitality or lessens the capacity of the intestinal organs to perform their usual functions. The only witness who testified that the auto-intoxication was due to the fall is Dr. Hancock, and the effect of his testimony is greatly weakened by the fact that although three other physicians were called in consultation with him, he did not mention to any of them the fact that Dr. Bethel had a fall or that the disease he was suffering with was attributable to it or an injury of any kind. Its force as probative evidence that the fall. caused the disease, is also much diminished by the fact that in the preceding February, Dr. Bethel suffered with an attack of auto-intoxication that was not produced by an accident, injury or fall, and that his symptoms then resembled the symptoms from which he suffered in April. This evidence, and we have stated it quite fully, was not sufficient to sustain the verdict. It was indispensible to a recovery that the evidence should show that the fall "independently of all other causes," produced the death of Dr. Bethel. Of course, if the accidental fall was the proximate cause of the auto-intoxication, which was the immediate cause of his death, then under the terms of the policy his death was caused "by external, violent and accidental means independently of all other causes." But the mere fact that he fell from the buggy was not sufficient to warrant a recovery unless the evidence showed that the auto-intoxication was produced independently of other causes by the fall, and it is at this vital point that the evidence for the appellee fails. It is true that there is some evidence that auto-intoxication may be produced by a fall; but, with the exception of the statement of Dr. Hancock, there is no evidence that the auto-intoxication in issue was produced by the fall, and his statement does not measure up to the requirements of the policy. The fall may have contributed in some degree to produce the auto-intoxication, but this is not enough. It is as fair to assume the auto-intoxication was due to natural causes as to the fall—in fact, the

history of Dr. Bethel's condition at the time he was sick in February, and afterwards is very persuasive, if not entirely convincing, that the causes that produced the auto-intoxication in February caused a recurrence of it in April.     As we said  in Fidelity & Casualty Co. v. Cooper, supra:

"If the injury or death is due to an accident, without the intervention of any diseased condition of the body, the company is liable.  It is not liable where the injury or death happened in consequence of the disease or bodily infirmity, and not of the accident, or, where it is due both to the accident and the disease.  But where the accident, and not the diseased condition, is the proximate cause of the death, the company is liable."

We have examined the cases of Standard L. & A. Co. v. Thomas, 13 Ky. Law Rep., 593, Continental Casualty Co. v. Sample, 112 S. W., 1122; American Accident Co. v. Reigart, 94 Ky. 547; Omberg v. U. S. Mutual Ac. Assn., 101 Ky. 303; as well as others, cited by counsel for appellee, but do not find that any of them are in conflict with the opinion we have expressed as to the insufficiency of the evidence in this case to sustain the verdict.

But, assuming that there was sufficient evidence to take the case to the jury, the remaining question is, was there any evidence at all to justify the jury in finding the full amount of the policy.  It will be observed that the policy provides that:

"In the event of death following bodily injuries of which there existed no external or visible mark upon the body or contusion or wound sufficient to cause death, * * * the limit of this company's liability shall be one-fifth of the amount otherwise payable under this policy. * * * "

The only evidence that there was any external  or visible mark of contusion or wound upon the body or person of Dr. Bethel is that there was a spot or bruise on his head, said to have been caused by his head striking the ground when he fell from the buggy.  And so the question is, was there sufficient evidence of contusion or wound to satisfy the requirement of this clause that the company by its pleading made it incumbent upon the appellee to bring her case within the terms of.  It is apparent that the policy contemplates two kinds of accidental death, one in which there are external and visible marks upon the body of contusion or wound sufficient to

cause death, and the other in which there are no external or visible marks of contusion or wound upon the body. That · the company had the right to thus classify the subjects of its insurance, and to provide that in one class they should receive larger indemnity than in the other, we have no doubt. Having the right to make this classification, it follows that it had the right to designate or describe the kind or character of injury that must be sustained in order to bring the insured within the terms of any particular clause for which indemnity was provided. This being so, the only matter left open is, does this clause describe or designate with sufficient clearness the character of injury that must be sustained to render its interpretation easy, and remove it from the operation of the rule that when an insurance contract is susceptible of two constructions, it will be given that one most favorable to the insured. Counsel for appellee contends in effect that the clause is ambiguous and being so, it should be construed to mean that if as a result of accidental injury there are any external and visible marks of contusion or wound upon the body and death results from the injury, independent of any other cause, then the contusion or wound was sufficient to show that death resulted from the injury, and so this clause has no application. But, giving to this clause the meaning the language employed conveys, we are unable to perceive how it can be construed as contended for by counsel. It provides that the contusion or wound must be "sufficient to cause death;" and if it is not, only one-fifth of the amount shall be payable. In other words, although the contusion or wound may have been serious, as well as external and visible, and have been produced by an accidental injury, yet unless it was sufficient to cause death the indemnity is reduced. It is only in cases where the wound or contusion is sufficient in and of itself to cause death independent of any other cause, that the full indemnity can be demanded. To interpret this clause as we are asked to do by counsel for appellee, would make it necessary to strike from it or give no effect to the words "sufficient to cause death." These words were inserted for a purpose, and intended to have a meaning, and under no fair rule of construction can they be ignored. The company had the right to thus limit its liability, and we do not feel authorized to extend or enlarge the limitation im-

posed by an interpretation that would eliminate from the contract words  that are plain, unambiguous and susceptible of only one meaning. If the clause was open to two constructions, or if it was of doubtful meaning, we would give to it that construction most favorable to the insured.  Spring Garden Ins. Co. v. Imperial Tobacco Co., 132 Ky., 7.  But, as it is not, we are of the opinion that in no event can the appellee recover more than one thousand dollars, and upon a re-trial, the jury should be so instructed.

Wherefore the judgment is reversed with directions to proceed in conformity with this opinion.

Whole Court Sitting—Judge Nunn dissenting.